**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
**THOMAS J. WHITE,**

                **Plaintiff,**

    -against -

**GOOGLE, LLC.,**

                **Defendant.**
-------------------------------------------------------------------X

Civil Action No.:

**COMPLAINT**

*Jury Trial Demanded*

Plaintiff Thomas J. White (hereinafter, "Plaintiff" or "Mr. White"), by and through his attorneys, Nesenoff & Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, Fifth Floor, New York, New York 10001, as and for his Complaint against Defendant Google, LLC (hereinafter, "Defendant" or "Google") respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiff, a former employee of Google, brings this action for damages against Defendant for violations of the Americans with Disabilities Act of 1990 (hereinafter, the "ADA") stemming from Google's callous dismissal of Mr. White based solely on Plaintiff's diagnosis of Tourette Syndrome (hereinafter, "Tourette"), a neurological condition causing involuntary and compulsive tics in those afflicted.

2.    Google, one of the largest multinational technology companies in the world, hired Plaintiff in 2015. Plaintiff, who has suffered from Tourette since the age of nine, looked forward to working for Google given its public declarations evidencing a dedication to inclusivity in the workplace. Indeed, from very early on in his career at Google, Defendant supported Plaintiff's outreach efforts to educate people, both within the company and the public at large, about Tourette

in an attempt to de-stigmatize the disorder from those who often treat the symptoms of Tourette as nothing more than a party joke. In fact, Google often sponsored Plaintiff's appearances to speak about Tourette, as if to parade him around and present him as the company's token disabled employee, thereby bolstering Google's reputation as an inclusive and progressive company.

3. This support, however, was nothing more than a façade as Google quickly turned its back on Plaintiff and openly terminated Mr. White's employment at a particularly vulnerable time based entirely on the manifestations of Plaintiff's Tourette symptoms. Specifically, amidst the peak of the COVID-19 pandemic, Mr. White was notified that a complaint was made against him based on a vocalization he *may have* made during a virtual meeting with other Google employees. Thereafter, Google embarked on nothing short of a witch hunt against Plaintiff and ultimately terminated Mr. White's employment based solely on an alleged involuntary tic caused by Mr. White's Tourette. Even more egregious, Google's agents questioned the validity of Mr. White's Tourette induced tics and admitted that Google had not considered whether the cause of Mr. White's alleged conduct was caused by his disability so as to trigger Google's obligations to accommodate Mr. White in the workplace.

4. As a result of Defendant's willful and wanton actions and/or inactions, Plaintiff's career with Google was cut unnecessarily short and Plaintiff has suffered tremendous financial loss and emotional damages which threatened Plaintiff's physical and mental well-being.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

6. Venue is proper in this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events which give rise to Plaintiff's claims took place in Queens County, New York which is in the Eastern District of New York.

7. All conditions precedent to suit have been fulfilled.

8. On or about December 1, 2020, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter, the "EEOC"), which was cross filed with the New York State Division of Human Rights.

9. In his EEOC Charge of Discrimination, Plaintiff also requested that the Charge of Discrimination be cross filed with the Illinois Department of Human Rights.

10. On or about June 2, 2021, the EEOC issued Plaintiff a Notice of Right to Sue letter.

11. This action is being commenced within 90 days of Plaintiff's receipt of his Notice of Right to Sue letter.

**PARTIES**

12. Plaintiff is a male citizen of the United States who is a resident and domiciliary of Nassau County, New York.

13. At all times relevant, Plaintiff was an "employee" of Google as that term is defined by the ADA.

14. Upon information and belief, Defendant was and is a Delaware corporation registered with the State of New York to do business therein and has a principal place of business located at 1600 Amphitheater Parkway, Mountain View, California 94043.

15. At all times relevant, Defendant was Plaintiff's "employer" as that term is defined by the ADA.

## FACTUAL ALLEGATIONS

**Plaintiff's Diagnosis with Tourette**

16. At the age of nine, Mr. White was diagnosed with Tourette.

17. Tourette is a neurological condition that forces those afflicted to have involuntary and compulsive tics, such as arm movements, facial movements, and random, uncontrollable vocalizations.

18. Mr. White was further diagnosed with Coprolalia, an exceedingly rare type of Tourette characterized by a very specific tic wherein the individual involuntarily and compulsively uses obscene and inappropriate language.

19. While some media outlets, such as movies and television, have exploited this disorder for cheap laughs, the reality is that Tourette, and Coprolalia specifically, are a daily nightmare for those suffering from the disorder, one in which their own mind and body often rebel against them.

20. Sufferers of Tourette often feel forced to isolate and withdraw from everyday society out of fear of being misunderstood, ostracized, or worse, demonized.

21. As a result of his diagnosis, Mr. White experienced, and continues to experience, unmitigated and involuntary vocal outbursts.

22. Unfortunately, there is no known cure or pharmaceutical remedy for Tourette.

23. Although Mr. White attempted to temper or hide these outbursts when they first began, doing so only made his manifestations of Tourette worse; what began as simple eye twitches in the third grade, evolved into a daily neurological war against Mr. White's own brain and body[1].

24. In an effort to address his diagnosis, Mr. White has undergone, and continues to undergo, extensive treatment, both behavioral and pharmacological, traditional and non-traditional.

25. Despite the overwhelming proclivity of victims of Tourette to retreat into themselves and away from society, Mr. White chose to do the opposite; supported by friends and family, Mr. White determined that he would not allow his disorder to define him but rather embraced it as a part of who he is.

26. Plaintiff's drive and determination compelled him to persevere and he went on to attain academic scholarships at Regis High School and the University of Notre Dame.

27. Mr. White has strived to excel in all of his endeavors, professionally and personally, in spite of his disorder and has made it part of his life's mission to bring awareness, education, and understanding of Tourette to society in the hopes that one day Tourette will cease being the butt of comedians' jokes or society's shame.

28. Indeed, Mr. White has given a TEDx Talk (*see* https://www.youtube.com/watch?v=0szLOMIt9SQ); has spoken about Tourette to North Shore-LIJ's Psychiatry residents; and has taken part in the Patient-Centered Outcomes Research Institute's Treating Tourette Together Conference.

---

[1] For additional information on Tourette and Mr. White's particular experience with Tourette, please see https://www.whitenoise.email/p/answering-my-most-frequently-asked, one of many pieces written by Mr. White regarding his experiences living with Tourette and Coprolalia.

29. Mr. White's outreach efforts and advocacy on behalf of those with Tourette continues to date as he continues to author papers and articles regarding Tourette, and presents at numerous speaking engagements and conferences regarding the disorder.

30. Despite his efforts to be more than just his disability, Plaintiff's Tourette often interrupts his ability to engage in normal everyday life, and has made common and major activities, including, but not limited to, speaking, difficult.

31. Moreover, during times of heightened stress, Plaintiff's symptoms were exacerbated and caused Mr. White to experience additional difficulty in speaking and concentrating.

32. Accordingly, at all times relevant herein, Plaintiff was (and is) disabled within the meaning of the ADA.

**Mr. White's History of Employment with Google and Google's Choice to Publicly Promote Plaintiff as the Company's Token Disabled Employee**

33. In or around September 2015, Mr. White began employment with Google as an Associate Account Strategist at Google's Ann Arbor office.

34. Plaintiff excelled in his position; at one point, he was the top salesperson within his organization in terms of productivity and revenue.

35. Subsequently, Mr. White worked for Google in San Francisco, California and, most recently, Chicago, Illinois on various teams in different capacities.

36. Most notably, in recognition of his stellar job performance, in or around November of 2019, Mr. White received his second of two promotions during his tenure, a rare and hard-earned feat at Google.

37. Further, Mr. White's role took him internationally as a Google employee and representative to Nigeria, Mexico, Brazil, and other countries.

38. As an employee, Mr. White never tried to hide the manifestations of his Tourette from Google and, instead, used his employment as an opportunity to further educate society about his disorder.

39. Initially, Mr. White's efforts were well received by Google.

40. Indeed, Google has a well-known public reputation for having an inclusive work environment, where diverse persons can allegedly feel safe and appreciated.

41. In line with that public reputation, Google often sponsored and encouraged Mr. White's outreach efforts to educate not only other Google employees, but society as a whole, about Tourette.

42. For example, Google selected Mr. White to speak at various company-wide seminars, conferences, and forums focused on diversity, disabilities, and mental health.

43. During his tenure with Google, Mr. White enjoyed his work and made close friendships with the majority of his colleagues.

44. Moreover, Mr. White's Tourette rarely caused him any concern or trouble, as Google appeared understanding and initially made efforts to work with Mr. White to allow him to flourish in the workplace. This, however, would suddenly and drastically change.

**COVID-19's Impact on Mr. White's Work Arrangement**

45. In March 2020, the COVID-19 "coronavirus" pandemic swept across the United States, causing many States to institute shelter-in-place orders and forcing many businesses to shut down, some permanently so.

46. Accordingly, in March 2020, Google's in-office operations shut down and Mr. White, along with thousands of other Google employees, began working remotely.

47. At the time of the shutdown, Mr. White was based in Chicago, Illinois.

48. In light of the new remote work arrangement, Mr. White returned home to New York, specifically Queens County, where he continued to perform his job duties and work with his usual team at Google via videoconference and other virtual means.

49. Mr. White would use a videoconferencing platform in order to "meet" with his team at Google wherein everyone who joined would be able to see and hear all other participants.

50. During the videoconferences, Mr. White's vocal manifestations still occurred.

51. Despite, this, for several months no issue was ever brought to Mr. White's attention regarding his involuntary, Tourette-induced vocalizations.

**Google Informs Mr. White That A Complaint Was Raised**
**Based on the Symptoms of His Disability**

52. In or around early May of 2020, Mr. White learned that a complaint had been lodged against him by Kyla Kelly ("Ms. Kelly"), a fellow Google employee.

53. Despite both working for Google, Ms. Kelly worked on a team that interacted with Mr. White's team on a very limited basis.

54. Notably, Google did not tell Mr. White the basis of Ms. Kelly's complaint, only that a complaint had been received; Mr. White was not offered any specifics about the substance of the complaint and was left to worry and wonder what he could possibly have done wrong.

55. In or around early May, 2020, Mr. White met via a videoconference with his Director, Kristen Nomura ("Director Nomura").

56. During that call, Director Nomura confirmed that the complaint was related to the manifestation of Mr. White's vocal tics.

57. From the sound of Director Nomura's statements, it appeared that Mr. White's Tourette and Coprolalia had forced him to unintentionally utter a derogatory vocal tic during a videoconference which offended Ms. Kelly.

58. Notably, however, Director Nomura continued to only give Mr. White general details, and would not get into specifics about Ms. Kelly's complaint.

59. On the videoconference, Mr. White attempted to explain the neurological aspect of his Coprolalia diagnosis and stressed that he would never intentionally offend anyone.

60. Mr. White further explained that he was terrified that his disability and the symptoms of his Tourette, which were completely out of his control, would jeopardize his career at Google.

61. Mr. White offered to take a proactive stance and address with Ms. Kelly and/or his entire team an explanation of his disability in the hopes that further education would help to resolve the issue.

62. In response, Director Nomura confirmed that she (i) was well aware of Mr. White's Tourette and had never seen it as an issue; (ii) knew Mr. White did not intentionally target Ms. Kelly; (iii) acknowledged that the current situation was very stressful for Mr. White which was making his Tourette symptoms worse; and (iv) advised that she hoped to find a way for all to move forward feeling safe.

63. Mr. White re-iterated that he felt as though there was now a target on his back because of his disability to which Director Nomura assured Mr. White that his performance was very strong and that everyone at Google had a high regard for him.

64. Following his conversation with Director Nomura, Mr. White submitted a breadth of materials to Google's Human Resources ("HR") personnel detailing his diagnosis and outreach efforts in the hopes that the materials would give HR a better understanding of the context in which the complaint arose.

**Google's HR Agent Questions Mr. White**

65. Following his call with Director Nomura, on or about May 7, 2020, Mr. White participated in a remote interview with HR.

66. During the interview, Google's HR agent stated that she was aware of the materials Mr. White had submitted and stated that she would try to take a holistic view of Mr. White's entire history with Google.

67. However, the HR agent advised that her only real focus was on the specific allegation in front of her and that she had not reviewed all of the submitted materials.

68. During the interview, Mr. White was asked if his vocalizations occurred in meetings to which Mr. White responded that they most likely did, as his vocalizations were something that he lived with every second of every day of his life.

69. Mr. White stressed, though, that his vocalizations are never intentional or targeted, and are not committed with any semblance of malice.

70. The interviewer then asked Mr. White what his various vocalizations are, to which Mr. White explained that they varied and depended on a myriad of factors but they were all always unintentional and a product of his disability.

71. In response, the interviewer admitted that she understood that Mr. White's vocalizations were uncontrolled and that there was no malicious intent behind them.

72. The interviewer then asked if, in April of 2020, one of Mr. White's vocalizations was the "N"-word, referring to the derogatory term for African-American and Black individuals.

73. In response, Mr. White truthfully answered that it could have happened but that he could not specifically recall if it occurred during any meetings in April.

74. Thereafter, Mr. White stressed that he always spoke openly about his disorder with his colleagues at Google and again encouraged the interviewer to review the resources and materials he had provided.

75. Mr. White told the interviewer that it would be crushing to be punished by Google for his disability because these words are not **his** words, but uncontrollable outbursts caused solely by his disability.

76. In response, the interviewer reiterated that she understood and was not disputing that Mr. White involuntarily and without malicious intent suffered from vocal tics but it was her job to determine if that violated Google's policies.

**Mr. White Agrees to Abide By Any Accommodations and Work Arrangements
To Allow Ms. Kelly To Feel Safe And To Allow His Continued Employment with Google**

77. After his meeting with HR, Mr. White again spoke with Director Nomura who then confirmed Mr. White was being investigated for a potential policy violation. Mr. White reiterated his fear that he would be punished for his Tourette.

78. Director Nomura advised that the HR team had brainstormed ways in which to immediately address the issue moving forward.

79. Two options were for Mr. White to remain on mute during video conference meetings until such time as he needed to speak at the meetings, or to not participate in the meetings at all and get de-briefed after the fact.

80. Director Nomura advised that her preference would be to have Mr. White attend the meetings but remain on mute until such time as he needed and/or wanted to contribute.

81. Mr. White made it inescapably clear that he was ready and willing to do whatever it took to address the issue and would make any and all changes and arrangements to ensure everyone he worked with felt comfortable.

82. Mr. White agreed that remaining on mute was acceptable to him and freely agreed to do so moving forward in meetings.

83. From that point onward, Mr. White participated in all video and other virtual meetings on mute, an arrangement which seemingly posed no imposition to him or others at Google.

84. On or about the day after his HR interview, Mr. White spoke to his managing director, Ryan Vauk ("Managing Director Vauk").

85. As he had expressed to the interviewer and Director Nomura, Mr. White told Managing Director Vauk of his fears that he would be punished for having Tourette, and asked Managing Director Vauk for any advice he could give.

86. Mr. White stressed that he was ready and willing to doing whatever it took to address the situation and move forward with his career at Google in a way that made everyone feel comfortable.

87. In response, Managing Director Vauk advised that while he was aware of the situation, he was not intimately involved in the investigation. Managing Director Vauk called Mr. White's predicament a "tough situation" but commended Mr. White for being a "very special talent."

**The Nation Finds Itself on the Brink of a New Civil Rights Movement**

88. On May 25, 2020, George Floyd, a black male, was murdered by a police officer in Minneapolis, Minnesota.

89. In response to George Floyd's murder, civil rights groups, advocates, and individuals erupted in a cry for justice, leading to public protests and marches in cities across the nation.

90. The public outcry following the death of George Floyd compelled corporations to take a public stand against racism and to publicly commit to racial equality, even if just to save face with consumers.

91. One such corporation was Google, who's CEO posted a message expressing Google's "support for racial equality in solidarity with the Black community…"

92. Notably, however, upon information and belief, Google had not taken such a public stance regarding racial equality in response to the deaths of other black individuals from years past, and had not responded to prior, less publicized protests calling for racial justice.

**Rather than Find a Way for All to Comfortably Continue Working Together, Google Chooses to Terminate Plaintiff on the Basis of His Tourette-Induced Symptoms**

93. On June 4, 2020, just days after Google's CEO's public social media post responding to the outcry from George Floyd's murder, Mr. White participated in another remote meeting regarding the ongoing investigation.

94. The tone of this meeting was far more sinister and serious than Mr. White's prior interviews and interactions with Google's representatives regarding the investigation.

13

95. During the meeting, Google's representatives accused Mr. White of having a widespread negative impact on his team and others at Google, and of making his colleagues at Google feel unsafe and uncomfortable going to work.

96. Notably, at the time this determination was made, all Google employees were working remotely so "going to work" consisted of nothing more than a Google employee remaining in his/her/their own personal space, far away and removed from any area where Mr. White was located.

97. In addition, this statement proved entirely false, as a multitude of Google employees came to Mr. White's defense following Google's actions towards him.

98. During the meeting, the Google representative advised Mr. White that the complained of behavior – meaning the manifestation of his Tourette-induced vocal tics – violated Google's policies regarding harassment, discrimination, and retaliation.

99. In essence, Google determined that having Tourette and Coprolalia is a violation of Google's policies, and made it inescapably clear that individuals afflicted with such disorders were not welcome at Google.

100. At such time, Mr. White was advised that his employment with Google was terminated, effective immediately.

101. Mr. White was shocked and dismayed at this outcome; for seemingly the first time in his life, Mr. White's disability had defined him and negated the nearly five years of accomplishments and achievements attained throughout his time with Google.

102. Mr. White stated during the meeting that his termination was a direct result of his disability and that one of the reasons he had, until that point, enjoyed working for Google was because of the company's policy of inclusivity.

103. Apparently, Google's policy did not include Mr. White, a victim of the disability of Tourette.

104. In response, Google's representative told Mr. White that while it may be his (meaning Mr. White's) position that his vocalizations were due to his Tourette, Google had not taken Mr. White's medical condition into consideration at all during its investigation.

105. Mr. White was startled to hear this; he re-iterated that he did not understand how Google could not see that his vocal tics were part and parcel of his disability, and expressed his dismay that Google had judged and punished him for having Tourette.

106. Notably, other than the short conversation with Director Nomura, no representative from Google ever discussed potential accommodations or other measures short of termination that would have allowed both Mr. White and Ms. Kelly to continue in their employment in a secure and inclusive manner.

107. Indeed, no one at Google even attempted to engage in any sort of dialogue with Plaintiff regarding possible accommodations, and never engaged in an interactive process to determine if there were mutually agreeable accommodations that could be put in place.

108. Rather, Google instead chose to enact the starkest punishment on Mr. White with no care for how such a decision would impact him.

109. Upon information and belief, Google's decision to terminate Plaintiff's employment was fueled, at least in part, by the social and public pressures placed on Google to respond harshly and quickly to perceived acts of discrimination following the death of George Floyd.

110. Upon information and belief, rather than come up with an innovative and fair way for both Plaintiff and Ms. Kelly to co-exist and continue their respective tenures at Google, Google folded under the pressures created from the backlash of George Floyd's death and acted with a breathtaking lack of restraint or foresight in deciding to terminate Plaintiff's employment rather than accommodate his disability.

111. Following Mr. White's termination of employment, a multitude of his former co-workers rallied to his defense and attempted to confront Google for the actions taken against Mr. White.

112. All efforts proved futile, however, as Google refused to discuss the matter and stood by its clearly discriminatory actions towards Mr. White.

113. Upon information and belief, Google filled Plaintiff's position not long after Mr. White's employment was terminated.

114. Upon information and belief, Plaintiff's position was filled by a candidate who did not suffer from Tourette.

## CLAIMS FOR RELIEF
### AS AND FOR THE FIRST CAUSE OF ACTION
*(Disability Discrimination – Unlawful Termination in violation of the Americans with Disabilities Act)*

115. Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

116. As set forth in detail above and herein, Plaintiff suffered (and continues to suffer) from a neurological disorder, specifically Tourette Syndrome coupled with Coprolalia, which cause involuntary tics and outbursts, and is therefore "disabled" under the ADA.

117. Plaintiff was qualified to work as an employee for Defendant and he satisfactorily performed the duties required by the position he held at Defendant.

118. As set forth in detail above and herein, Defendant subjected Plaintiff to disparate treatment and disparate discipline on the basis of his disability.

119. As set forth in detail above and herein, Defendant unlawfully terminated Plaintiff's employment solely on the basis of Plaintiff's symptoms of and diagnosis with Tourette.

120. The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of his employment and culminated in Plaintiff's discriminatory discharge.

121. By reason of Defendant's violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with his employment.

122. As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered mental anguish, severe anxiety about his future, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his personal and professional reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

123. Accordingly, Defendant discriminated against Plaintiff by virtue of treating Plaintiff less well than his similarly situated colleagues and subjecting Plaintiff to an unlawful termination of employment in violation of his statutory rights as guaranteed by the ADA.

124. As a result of the foregoing, Google, LLC. is liable to Mr. White for damages in an amount to be determined at trial.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Failure to Accommodate in violation of the Americans with Disabilities Act)*

125. Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

126. As set forth in detail above and herein, Plaintiff suffered (and continues to suffer) from a neurological disorder, specifically Tourette Syndrome coupled with Coprolalia, which cause involuntary tics and outbursts, and is therefore "disabled" under the ADA.

127. As set forth in detail above and herein, Defendant was aware and on notice of Plaintiff's disability and the symptoms thereof.

128. As set forth in detail above and herein, Defendant disregarded Plaintiff's disability and disability related symptoms when it made the decision to terminate Plaintiff's employment on the basis of Plaintiff's manifestation of Tourette related tics.

129. Prior to Plaintiff's termination, Plaintiff advised that he was ready, willing, and able to discuss any possible accommodation to permit himself and his co-workers to continue working together in harmony.

130. Despite this, Defendant failed to engage in an interactive process with Plaintiff to determine what, if any, accommodation(s) could be reached in order to sustain Plaintiff's employment with Google and, instead, terminated Plaintiff's employment on the basis of Plaintiff's manifestation of Tourette related tics.

131. Accordingly, Defendant discriminated against Plaintiff by virtue of failing to accommodate his known disability and failing to engage in an interactive process in violation of the ADA.

132. As a result of the foregoing, Google, LLC. is liable to Mr. White for damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons Plaintiff demands judgment against Defendant as follows:

(i) An Order enjoining Defendant, along with its agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of disability, including the failure to accommodate disabilities in the workplace;

(ii) An Order enjoining Defendant, along with its agents, employees, and those acting in concert therewith, from retaliating against Plaintiff for the instigation or and participation in this action;

(iii) A judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, reimbursement and repayment of all back wages, payment of Plaintiff's expenses incurred as a consequence of his termination of employment, and damages to Plaintiff's physical well-being, emotional and psychological damages, past and future economic losses, and loss of career opportunities;

(iv) Punitive and/or exemplary damages against Defendant, as available;

(v) Statutory pre- and post-judgment interest on all sums awarded;

(vi) An award of costs and attorneys' fees; and

(vii) Any other relief the Court finds just and proper.

**Dated:** New York, New York
August 31, 2021

**NESENOFF & MILTENBERG, LLP.**
*Attorneys for Plaintiff*

*/S/ Andrew Miltenberg*
**Andrew T. Miltenberg, Esq.**
**Gabrielle M. Vinci, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**